## Conrad Seipp Brewing Company v. Emil Hart.

1. EVICTION—*Acts of One Tenant, When Chargeable to the Landlord.*—An act done by one tenant, without the authority, consent or connivance of the landlord, can not be treated as an eviction by other tenants.

2. LANDLORD AND TENANT—*Responsibility for the Acts of the Tenant.* —Where a landlord makes a lease to a third person of all or a portion of the premises before leased to another, the acts of such third person, within the terms of his lease, are considered as authorized by the landlord.

Debt for Rent.—Appeal from the Circuit Court of Cook County; the Hon. ELBRIDGE HANECY, Judge, presiding. Heard in this court at the October term, 1895. Affirmed. Opinion filed January 22, 1896.

### STATEMENT OF THE CASE.

On the 1st day of September, 1892, Emil Hart, appellee, demised to the Conrad Seipp Brewing Company, appellant, the basement under the store known and described as No. 282 State street, Chicago, in the building at the southwest corner of State and Van Buren streets, for a term beginning on the 1st day of September, 1892, and expiring on the 30th day of April, 1898, at a rental of $13,000, payable in sixty-eight monthly installments, as follows: The first eight installments of $125 each, and the last sixty installments of $200 each upon the first day of each and every month in advance during the said term.

The Brewing company took possession of the premises in question, and leased them to sub-tenants, for the purposes of a saloon, from the date of the lease up to and including the 11th day of December, 1894, at which time the Brewing company vacated the premises and tendered the keys of the same to the appellee.

At the time the premises were leased to the Brewing company the store floor, being the floor just above the basement, was occupied by a firm known as Strelitz Brothers, who were also tenants of appellee, and the Strelitz Brothers remained in possession of the same up to the latter part of September, 1894, at which time they vacated the same. Thereupon, the appellee leased the premises formerly occupied by the Strelitz Brothers to Philip Simon, under a lease dated the 28th day of September, 1894, for a term beginning on the 1st of October, 1894, and expiring on the 30th of April, 1898, at a rental of $16,125, payable in monthly installments of $375 each upon the first day of each and every month, in advance.

Simon subsequently, on or about the 1st of October, 1894, took possession of the premises, and was in possession of the same at the time of the commencement and the trial of this case.

The basement leased from Hart to the Seipp company was all in one open space, with about twenty-seven feet front on State street and sixty-five feet front on Van Buren street. The entrance to the basement was upon Van Buren street, about thirty-five feet from State street. The storeroom occupied by the Strelitz Brothers, and at present by Philip Simon, ran west from State street over the basement about thirty-five feet.

The rest of the space occupied by the basement ran under other stores west of the west end of the store occupied by the Strelitz Brothers.

At the time of the lease from Hart to the Seipp company, the premises in question had two windows opening out from the basement to State street, and five windows opening out from the basement to Van Buren street,

all of said windows being under the premises at that time occupied by the Strelitz Brothers, and at present occupied by Philip Simon. These windows were used by the tenants in the basement for the purposes of light, ventilation and advertising the business conducted therein. At the time the premises were leased to the Seipp company the windows on State street were about three feet six inches high. The door on State street was in the center of the store floor.

At or about the time Philip Simon took possession of the premises, the windows under the store leased by Simon, opening out from the basement onto State and Van Buren streets, were cut down, and the door which had formerly been in the central portion of the store floor, was moved to the southern side of the store, taking up more room than it formerly did. After the alterations were made, the windows on State street, which had formerly been thirty-six inches high, were twenty-four inches high. The door was so changed as to take up more room than it formerly did, it taking up, it is contended, more light than it did originally.

The new windows which were put in the basement had no hinges put on them, and the advertisements which had been thereon were cut it two.

At the time these changes were made, the basement was unoccupied and the Seipp company did not discover that any changes had been made until the tenth or twelfth of November. The November rent had, at that time, already been paid by the Brewing company to the appellee.

Subsequent to the date of the discovery of the alleged changes in the premises, the Brewery company made efforts to lease the same again to other tenants, but was unable to find any tenant who would take the same; and when the December rent fell due the company declined to pay its rent. On the eleventh of December it moved out of the premises, and tendered the keys to Hart, who declined to accept them.

Appellee contended that at the time the lease was made between the parties, the natural light, which entered the

basement, was admitted through prismatic lights set in the sidewalk, and through a number of bulkhead windows, the lower frames of which were on a level with the sidewalk, and the upper frames were about three and one-half feet above the sidewalk level; that the glass in those windows was two feet and eight inches high, or, according to the testimony of the architect, Ottenheimer, two feet and two inches; that the basement ceiling was about six inches below the sill of the windows, and that as the lower frame and window-sill was from four to six inches wide, the lower edge of the glass was about ten or twelve inches above the basement ceiling; that the light from these windows was not admitted directly into the basement; that on the inside of each window was a perpendicular open shaft or bulkhead extending from the basement ceiling to the top of the window, their depth being about eighteen or twenty inches; that the amount of light which the basement could receive from these windows, was dependent upon the depth of the bulkhead.

Appellant contended that the light of the basement was greatly lessened by the alterations; that the windows which swung on hinges were made fast, and means of ventilation thus cut off; and that appellant was deprived of valuable advertising space.

The lease from appellee to appellant contained a clause which provided that the lessor shall " not be liable for any damages arising from the acts or neglect of co-tenants or other occupants of the same building, or of any owners or occupants of adjacent or contiguous property."

The fourth clause of the lease provides that the lessee will not allow "any signs or placards posted or placed thereon, except by written consent of the lessor."

This action was brought for rent under the lease for the months of December and January.

The court found for the lessor, for the entire rent as fixed by the lease for such months.

Winston & Meagher, attorneys for appellant.

MORAN, KRAUS & MAYER, attorneys for appellee.

The acts shown by the evidence could, under no circumstances, show more than a constructive eviction, concerning which the Supreme Court in Keating v. Springer, 146 Ill. 481, said: "But the landlord, without being guilty of any actual physical disturbance of the tenant's possession, may yet do such acts as will justify or warrant the tenant in leaving the premises. The latter may abandon the premises in consequence of such acts, or he may continue to occupy them. If he abandons them, then the circumstances which justify such abandonment, taken in connection with the act of abandonment itself, will support a plea of eviction as against an action for rent. If, however, the tenant makes no surrender of the possession, but continues to occupy the premises after the commission of the acts which would justify him in abandoning, then he will be deemed to have waived his right to abandon; and he can not support a plea of eviction by showing that there were circumstances which would have justified him in leaving the premises."

Rice, C. J., in speaking of a constructive eviction, said: If the tenants failed to abandon within a reasonable time, or did any act inconsistent with the right to abandon, they would thereby waive that right. Crommelin v. Theiss, 31 Ala. 412. See, also, 2 Wood's Landlord and Tenant (2d Ed.), 1106–7.

But had appellant pleaded an eviction, the facts disclosed on the record would not support such a plea, even if there were no evidence of waiver.

Acts of the landlord, in interference with the tenant's possession, to constitute an eviction, must clearly indicate an intention on the part of the landlord that the tenant shall no longer continue to hold the premises. Morris v. Tillson et al., 81 Ill. 607.

There are clearly some acts of interference by the landlord with the tenant's enjoyment of the premises, which do not amount to an eviction, but which may be either acts of trespass or eviction, according to the intention with which they are done. If those acts can not amount to a clear in-

dictment on the landlord's part, that the tenant shall no longer continue to hold the premises, they would constitute an eviction. Lynch v. Baldwin, 69 Ill. 210.

Any act of a permanent character done by the landlord, or with his authority, with the intention of depriving the tenant of the full enjoyment of the premises as demised, or of any part thereof, operates as a constructive eviction. 2 Wood's Landlord and Tenant (2d Ed.), 1101.

MR. JUSTICE WATERMAN DELIVERED THE OPINION OF THE COURT.

It is difficult to determine from a reading of the testimony in this case, whether there was a material interruption of the beneficial use of these premises. We are inclined to think there was, and such seems to have been the opinion of the judge before whom the cause was heard.

Admitting that there was such interference, and that the same was not done by the authority, consent or connivance of the landlord, it is contended that the acts of a lessee of the landlord are to be charged to him, and may be treated as an eviction, the same as if performed by the direction of the landlord. In other words, that certain acts of one tenant may be treated by another tenant of the same landlord as amounting to an eviction by the lessor, although the respective tenancies are entirely distinct properties, and the landlord in no way consented or connived at such acts.

We are not aware of any authority for such position. The cases cited by appellant are of acts directly authorized by the landlord. Where a landlord makes a lease to a third party of all or a portion of the premises already by him leased to another, the acts of such third party within the terms of his lease, are authorized by the landlord.

In the present case, the letting by the landlord to Simon is of premises, no portion of which was leased to appellant.

Under the contention of appellant, it is difficult to see where, logically, we are to stop. The habitual bringing by the lessor of lewd women under the same roof as that of the demised premises, in consequence of which nocturnal

noise and disturbance was made, has been held to be an act which the lessee may treat as an eviction. Taylor's L. & T., Section 381.

So the letting by the landlord of adjacent premises for the purpose of gaming, or himself carrying on in adjacent rooms a gambling house, to the disturbance of his tenant by noise, profane and obscene expressions, may be treated as an eviction. Rowbotham v. Pearce, 5 Houst. 135.

That a tenant should have the right to treat the immoral and disturbing conduct of tenants of other premises as an eviction by the common landlord, although he may have been entirely ignorant of the character, purpose in renting, or conduct of such tenants, would seem unjust; it would be, however, no more unjust than to treat detrimental and unlawful acts in the way of shutting off light, changing doors, and things of that nature, as an eviction, although done without the consent, connivance or knowledge of the landlord. In the first instance the injustice is more apparent because the wrongful imputation is of acts immoral and unlawful, while in the second it is of unlawful conduct only.

The court below found that the acts complained of were done without the authority, consent or connivance of the landlord.

The evidence that appellee consented to the alterations made by Mr. Simon, was inferential; the testimony that he did not was positive and unequivocal.

We are not warranted in interfering upon such evidence with the finding of the trial court. The judgment of the Circuit Court is affirmed.